No. 101,949

CRITCHFIELD PHYSICAL THERAPY, Individually and as the Representative of a Class of Similarly Situated Persons, *Appellee*, v. THE TARANTO GROUP, INC., *Appellant*.

(263 P.3d 767)

Opinion filed September 30, 2011.

*Leonard R. Frischer*, of Frischer & Associates, Chtd., of Overland Park, argued the cause, and *Mark B. Schaffer*, of the same firm, was with him on the briefs for appellant.

*Rex A. Sharp*, of Gunderson, Sharp & Walke L.L.P., of Prairie Village, argued the cause, and *Barbara C. Frankland*, of the same firm, and *Max Margulis*, of Margulis Law Group, of Chesterfield, Missouri, *Brian J. Wanca*, and *Ryan Kelly*, of Anderson & Wanca, of Rolling Meadows, Illinois, and *Phillip A. Bock* and *Tod A. Lewis*, of Bock & Hatch, L.L.C., of Chicago, Illinois, were with him on the briefs for appellees.

*Todd N. Thompson* and *Sarah E. Warner*, of Thompson Ramsdell & Qualseth, P.A., of Lawrence, were on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

ROSEN, J.: This is an interlocutory appeal from an order certifying a class of plaintiffs in an action seeking damages under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 (2006).

The Taranto Group, Inc., (Taranto) is a small business incorporated in Kansas and located in Leawood. Taranto distributes and resells aesthetic medical devices such as microdermabrasion equipment and medical lasers to physicians and aesthetic professionals. From March 2005 to March 2008, Taranto contracted with two

outside vendors to send out advertising via facsimile transmissions ("fax" or "fax transmissions") on its behalf. These vendors were AmeraScope Media, Inc. (AmeraScope), of Nebraska, which sent faxes from March 2005 to November 2006, and Westfax, Inc. (Westfax), of Colorado, which sent faxes from February 2007 to March 2008. Taranto did not own or review the databases or transmission logs used by AmeraScope. AmeraScope purchased its databases from a third party. Those databases are no longer available. Westfax obtained its physician database from Taranto, which purchased a "Dr-411" database from a third party; Taranto did not, however, possess or review the Westfax transmission logs.

Some of the fax recipients may have been customers who had consented to receive fax transmissions from Taranto or who had an ongoing business relationship with Taranto, but discovery is incomplete with respect to how many fax targets fell into that category. In a pleading seeking removal of the action to federal court, Taranto's predecessor in interest, and the original defendant in this action, calculated that at least 5,000 transmissions were made in violation of the TCPA. See *Geismann v. Aestheticare, LLC*, 622 F. Supp. 2d 1091, 1096-97 (D. Kan. 2008). It is estimated that some 122,000 fax transmissions were completed, although not every fax number targeted has been specifically identified.

Radha Geismann, M.D., a Missouri professional, brought an action individually and as the representative of similarly situated persons against Aestheticare, a Kansas limited liability company, alleging violations of the TCPA. An amended petition named the Taranto Group as an additional defendant. The action sought damages and injunctive relief under the TCPA and tort damages for conversion. Critchfield Physical Therapy, P.C., d/b/a Montgomery County Physical Therapy (Critchfield), a Missouri professional corporation, subsequently filed a petition seeking to intervene as an additional class representative. The parties later stipulated to dismissing Aestheticare, L.L.C., as a party defendant without prejudice. The parties then stipulated to dismissing Geismann without prejudice and substituting the intervener Critchfield as the sole individual plaintiff and as the representative of the proposed class.

The district court issued an order certifying the proposed class and, in an amended order, certified the order for interlocutory appeal under both K.S.A. 60-223(f) and K.S.A. 60-2102(c). After the Court of Appeals granted Taranto's application for permission to take an interlocutory appeal, this court granted Taranto's motion to transfer.

*The Statutory Framework for Class Actions under the TCPA*

Class action lawsuits are based in equity and allow suits where the number of parties interested in the subject of the litigation is so great that it is impracticable to join them under the usual rules of civil procedure. *Hansberry v. Lee*, 311 U.S. 32, 61 S. Ct. 115 41, 85 L. Ed. 22 (1940). Class actions also permit plaintiffs to pool claims that would be uneconomical to litigate individually. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985).

Class action lawsuits are governed by statute in Kansas. K.S.A. 2010 Supp. 60-223(a) sets out four requirements for class certification:

"One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

These threshold requirements have been summarized as numerosity, commonality, typicality, and adequacy of representation. *Dragon v. Vanguard Industries* (*Dragon II*), 282 Kan. 349, 355, 144 P.3d 1279 (2006); *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374(2011) (applying requirements to Federal Rule of Civil Procedure 23[a]).

The statute continues, in relevant part:

"(b) *Types of class actions.* A class action may be maintained if the prerequisites of subsection (a) are satisfied and if:
    "(1) Prosecuting separate actions by or against individual members would create a risk of: (A) Inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual

class members that as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

"(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) The class member's interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." K.S.A. 2010 Supp. 60-223.

The litigation in the present case was initiated under the TCPA, 47 U.S.C. § 227, which establishes a hybrid of federal and state law. The federal statute empowers plaintiffs to seek damages in state courts and empowers state attorneys general to seek damages, injunctive relief, and penalties in federal courts when there is reason to believe that a person has engaged in a pattern or practice of telephone calls or other communication transmissions to residents of those states in violation of the Act.

The TCPA is a federal response to the ever-increasing access through electronic means that advertisers have to consumers. State legislatures had enacted restrictions on unsolicited telemarketing before the federal legislation, but such measures had limited effect because states lacked jurisdiction over interstate calls. It was estimated that some 6.57 billion telemarketing transmissions were being made each year by the early 1990's. *Intern. Science & Tech. Institute v. Inacom Comm.*, 106 F.3d 1146, 1157 (4th Cir. 1997). Congress intervened and enacted the TCPA in 1991 to address telemarketing abuses. See *Rudgayzer v. Cape Canaveral*, 22 A.D.3d 148, 149, 799 N.Y.S.2d 795 (2005) (discussion of the historical background of the TCPA).

During the debates regarding the "junk fax" provision of the TCPA, Congressman Edward Markey (D-MA) stated:

"Every time someone junk faxes you, it is your paper that is coming out of the machine. You are paying for that paper. Your machine is tied up. It is absolutely one of the most irritating things to people, to have to pay for someone else coming into your home or your business when you do not want them there. It is essentially a tax which is paid by the recipient of something that they never asked for in the first place." 151 Cong. Rec. H 5264 (daily ed. June 28, 2005).

In short, the primary purpose of the TCPA is to prevent businesses from shifting their advertising costs to the recipients of unsolicited fax advertisements. See *Phillips Randolph v. Adler-Weiner Research Chicago*, 526 F. Supp. 2d 851, 852 (N.D. Ill. 2007).

The TCPA prohibits, among many other practices, the use of "any telephone facsimile machine, computer, or other device to send to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). The TCPA only prohibits "unsolicited" advertising. An "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

The TCPA creates a private right of action against a sender of an unsolicited advertisement and provides that, for each violation, a person is entitled to $500 or actual damages, whichever is greater, as well as treble damages if a court finds the violation to be willful or knowing. 47 U.S.C. § 227(b)(3). The Act also provides for private causes of action in state court, and the state courts have exclusive jurisdiction over those actions. See *Foxhall Realty Law Offices v. Telecom. Prem. Serv.*, 156 F.3d 432, 437-38 (2d Cir. 1998).

One consequence of state causes of action is that the private remedy may vary from state to state. See *e.g.*, *Foxhall Realty*, 156 F.3d at 438; *Intern. Science & Tech. Institute*, 106 F.3d at 1157 (although TCPA private actions may be permitted in some state courts and not in others, does not violate equal protection); *Rudgayzer*, 22 A.D.3d at 152 (because TCPA does not specifically authorize class action suits, New York does not permit class action suits under TCPA under New York class action law); *Schulman v. Chase Manhattan*, 268 A.D.2d 174, 178-79, 710 N.Y.S.2d 368

(2000). As a consequence, decisions in other states, while possibly persuasive in their reasoning, are not binding on courts in this state.

In 2005, Congress enacted the Junk Fax Prevention Act of 2005, which amended the TCPA and added language to § 227(b)(1)(C) that prohibits sending an unsolicited advertisement to a telephone facsimile machine unless "the unsolicited advertisement is from a sender with an established business relationship with the recipient."

*Standard of Review*

The standard of review for the decision to certify or not to certify a class is whether the trial court abused its discretion. The amount and degree of such discretion depends on the character of the question presented for determination. In general, when the discretionary decision is made within the legal standards and takes into account the proper factors, the decision will withstand review even if it appears unwise.

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801(2011) (citing *State v. Gonzalez*, 290 Kan. 747, 75556, 234 P.3d 1 [2010]).

While a trial court has substantial discretion in determining whether a class should be certified, that decision must be rigorously analyzed in light of the provisions of K.S.A. 2010 Supp. 60-223. *Dragon II*, 282 Kan. at 354; *Bigs v. City of Wichita*, 271 Kan. 455, 477, 23 P.3d 855 (2001); *Tuley v. Kansas City Power & Light Co.*, 252 Kan. 205, 217, 843 P.2d 248 (1992); *Steele v. Security Benefit Life Ins. Co.*, 226 Kan. 631, 638, 602 P.2d 1305 (1979).

*The Plaintiff's Burden to Demonstrate Meeting the Statutory Requirements for Class Certification*

In a class action lawsuit, the named representatives of the plaintiff class assume the burden of proving the total class-wide damages rather than the individual damages of each member of the class.

*Gilley v. Kansas Gas Service Co.*, 285 Kan. 24, 29, 169 P.3d 1064 (2007).

The district court held that plaintiff has the evidentiary burden of proving each class certification factor, and because class certification comes before merits discovery is complete, the burden is "light" or "prima facie." The district court would only consider evidence from the defendant that was undisputed, and it would not determine factual disputes or judge credibility.

Taranto contends that the district court misstated the governing burden of proof. Taranto directs us to the "rigorous analysis" language of *Dragon v. Vanguard Industries, Inc.* (*Dragon I*), 277 Kan. 776, 783, 89 P.3d 908 (2004), to support its argument that plaintiffs must present more than a prima facie case for class certification. There is, however, a difference between rigorous analysis of statutory factors and a heavy burden of proof on plaintiffs.

There is little dispute over certain essential facts. Taranto arranged for mass fax transmissions without regard to whether the targets had an established business relationship with Taranto or had given permission to receive fax advertising. Such fax transmissions violate federal law. The only factual disputes involve identifying who the fax targets were and winnowing out those who gave consent or who had an existing business relationship with Taranto. These are not trivial matters, but they are explicit factual matters susceptible to review by this court based on the factual record.

We do not read our holding in *Dragon I* to require that a district court conduct a mini-trial with extensive fact-finding before certifying or denying certification to a class. The district court must rigorously analyze the proffered evidence to determine whether the plaintiffs have met or are likely to meet the statutory requirements for certification.

In *Display South v. Express Computer Supply*, 961 So. 2d 451, 455 (La. App. 2007), the court held:

"It is not necessary for [the plaintiff] to prove the facts of the underlying cause of action. Class certification is purely procedural. Therefore, the issue at a class certification hearing is whether the class action is procedurally preferable, not whether any of the plaintiffs will be successful in urging the merits of their claims. [Citation omitted.]"

The major evidentiary stumbling blocks for the class will be determining to whom the fax transmissions were sent and whether those parties had given consent or had an established business relationship with the sender. These are not inherent barriers to class certification.

Although there is no evidence that Taranto intentionally destroyed records in order to defeat litigation, a defendant cannot escape liability simply by losing or destroying the list of its victims. See, e.g., *Appleton Electric Co. v. Advance-United Expressways*, 494 F.2d 126, 139 (7th Cir. 1974) ("Class actions cannot be defeated by destroying records."). In *Sadowski v. Med1 Online, LLC*., No. 07C 2973, 2008 WL 2224892, at *3 (N.D. Ill. 2008), the plaintiffs accused the defendants of sending out junk faxes in violation of the TCPA and sought class certification. In response, the defendants claimed numerosity was not satisfied because the list of potential plaintiffs had been destroyed and the class size was speculative because the list of fax numbers no longer existed. The court rejected this argument, reasoning that a good faith estimate can be sufficient where the class members are not readily ascertainable. The court found that common sense allowed the inference that a significant number of the junk faxes allegedly sent by the defendant were sent unlawfully and that denying class certification would unfairly punish the victims, especially where the missing list of recipients was last in the defendant's possession. See also *Smith v. Greystone Alliance LLC*, No. 09C5585, 2010 WL 2680147, at *3 (N.D. Ill. 2010) (failure to maintain a list of contacts will not defeat class action; otherwise, debt collectors could freely violate the Fair Debt Collection Practices Act by electing not to record their messages); *Heckert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348-49 (N.D. Ill. 2008) (master list of potential class members not essential for class certification if class members can be ascertained by reference to objective criteria).

We agree with the reasoning set out in *Sadowski* and the related cases, and we conclude that it was unnecessary for the district court to require the plaintiff to prove at the time of certification that all or most of the potential class were entitled to damages under the TCPA. It is not necessary that class description identify every in-

dividual member of the class from the outset. It suffices that the description identifies a group of plaintiffs by describing a set of common characteristics such that a member of the group may demonstrate a right to recovery based on the description.

The plaintiff presented sufficient evidence and reasonable allegations based on that evidence and the statutory scheme to allow the district court to conclude that class certification was appropriate, analyzing each factor in light of the proffered evidence. The district court fulfilled its requirement to engage in a "rigorous analysis" of the factors for certification without conducting a trial within a trial to determine the relationship of each potential class member with the defendant.

*Commonality and Predominance*

Taranto next contends that two fundamental flaws undermine class certification. First, it argues, there is no commonality among persons receiving the fax advertising, because some of those persons may have given consent or may have had an established business relationship with Taranto. Second, there is no commonality because there is no proof that the persons on the data lists actually received the fax transmissions.

Commonality requires a plaintiff to demonstrate that the proposed class members have suffered the same injury and their claims must depend on a common contention that is capable of class-wide resolution, meaning that determination of its validity will resolve an issue that is central to the validity of each of the claims with one answer. *Wal-Mart Stores*, 564 U.S. at ___, 131 S. Ct. 2541, 2551.

Some courts have denied class certification based on the possibility that some putative class members fall within the statutory exceptions to the ban on fax advertising. See, *e.g.*, *Gene and Gene LLC v. Biopay LLC*, 541 F.3d 318, 328-29 (5th Cir. 2008) (question of consent defeats cohesiveness of class); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1169 (S.D. Ind. 1997) (denying class certification because consent would have to be proven via individual inquiries as to each class member); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995) (mass fax trans-

missions did not constitute a common course of conduct by the defendant but were "a series of individual transmissions under individual circumstances, each of which is an alleged violation of the statute").

Other courts, however, have considered sending mass fax transmissions to be conduct susceptible to class action certification.

In *Display South*, 961 So. 2d at 457, deposition testimony showed that the defendant possessed a database of customers and prospective customers. This database indicated numerous faxes were sent during the relevant time frame to over 700 potential class members. The Louisiana Court of Appeals held:

"The receipt of unsolicited advertisement faxes is common to all the potential class members, and, in fact, defines the class. This is the claim made by [the plaintiff] and is not only typical of the claims of the other class members, but is identical to the claims of the other members.

"[The defendant] contends that because an established business relationship with the recipient of a faxed advertisement is a defense that precludes a finding of a violation of the law, individual questions predominate over common issues. However the arguments made in support of their position go to the merits and not to the issue of class certification. A class action is a procedural device and confers no substantive rights. The only issue at the certification hearing is whether the case is one that would benefit from the procedural classification as a class action. [Citation omitted.] While affirmative defenses should be considered in determining the merits of maintaining the lawsuit as a class action, the fact that some plaintiffs may offer a defense does not prohibit certification of a class. [Citation omitted.] Also, if the trial court determines that a defense is available to individual members such that maintenance of the class is no longer feasible, the class can be decertified."

The court in *Lampkin v. GGH, Inc.*, 146 P.3d 847, 852, 854-55 (Okla. App. 2006), similarly held:

"Defendants assert there is no commonality because the trial court would have to make inquiries as to whether each potential class member gave permission for Defendants to send the fax and whether Defendants had a business relationship with each potential member. We find that the issues involving permission and/or a prior business relationship do not defeat the 'commonality' of the class members' claims against Defendant.

"First, the class defined by [the plaintiff] consists of only those individuals who received unsolicited fax advertisements during the specified time period. The use of the term 'unsolicited' would foreclose argument on the theory that some class members somehow gave prior permission to Defendants to send the faxes to their

fax machines. Furthermore, we find that Defendants should bear the burden of showing that there are circumstances that remove their actions from the reach of the TCPA. If the Defendants want to assert that they either received prior permission from an individual to send the fax or that there was a prior established business relationship in defense to an individual's claim that he or she received an unsolicited fax, they should bear the burden of proving the existence of the permission or relationship. The recipients should not be charged with proving that they did not give permission or that they did not have a business relationship with Defendants. We reach this decision on the burden of proving permission or an established business relationship with the guidance of the FCC's interpretation of an established business relationship.

. . . .

". . . The Defendants are in a much better position to show the fax recipients with whom they had an established business relationship. Potential class members should not have to show that they did not have an established business relationship with Defendants in order to become a member of the class. If Defendants choose to assert that they have an established business relationship with a class member, Defendants may bring forth evidence in support of their defense. We see no reason to require every potential class member to prove the absence of an established business relationship where Defendants are in the best position to show that the TCPA prohibition against junk faxes does not apply to them due to an established business relationship."

We find the reasoning of these cases persuasive. It will be possible for the litigation to generate answers in common for the proposed class to questions raised in common by the class. See *Wal-Mart Stores*, 564 U.S. at ____, 131 S. Ct. at 2551. Although Taranto may be able to show that some putative members of the plaintiff class fall within the statutory exceptions, this possibility does not defeat certification at this stage of the proceeding. It should be a relatively simple matter to separate those parties out of the class without requiring a series of mini-trials on the question of consent or an established business relationship. If Taranto demonstrates that so many parties fall within the exceptions that the integrity of the class is undermined, then the district court may consider decertifying the class.

Taranto also argues that the plaintiff class lacks a common interest because it cannot be shown that the persons listed in the databases received the fax transmissions.

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained.

*Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 785, 189 P.3d 508 (2008). If possible, we ascertain that intent through the language the legislature employed, giving ordinary words their ordinary meaning. *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009); see also *I.N.S. v. Phinpathya*, 464 U.S. 183, 189, 104 S. Ct. 584, 78 L. Ed. 2d 401 (1984) (courts assume Congress expressed legislative purpose by ordinary meaning of words used).

The TCPA specifically prohibits using electronic devices "to send" unsolicited advertisements. 47 U.S.C. § 227(b)(1)(C). The statute creates no requirement that a transmission be received, although the statute addresses exceptions for "recipients" who had established business relationships or who gave permission for advertisers to send them fax promotions.

The reality that some plaintiffs may not have received the unlawful fax transmissions does not defeat their entitlement to damages. Although the harm resulting from unsolicited fax transmissions is often described in terms of recipients, the harm also extends to intended recipients, or targets of mass fax advertising. For example, a business may have considered it necessary to turn off its fax machine because of unwanted fax transmissions. The business might not have received the advertising, but it would still have incurred a disadvantage as a result of advertisers sending the fax messages. We therefore find that the legislation expressly using the word "send" is to be construed to mean "send" and not "receive."

The Seventh Circuit Court of Appeals has noted:

"Many statutes, notably consumer-protection statutes, authorize the award of damages (called 'statutory damages') for violations that cause so little measurable injury that the cost of proving up damages would exceed the damages themselves, making the right to sue nugatory. . . . The award of statutory damages could also be thought a form of bounty system, and Congress is permitted to create legally enforceable bounty systems for assistance in enforcing federal laws, provided the bounty is a reward for redressing an injury of some sort (though not necessarily an injury to the bounty hunter)[.]" *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 665 (7th Cir. 2001).

Through the plain language of the statute, Congress clearly intended to restrict business in *sending* unsolicited fax advertising.

This interpretation is consistent with opinions interpreting the word "call" in the TCPA to include *attempts* to make telephone calls, even when the call was not completed. See *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010) (definition of "call" includes to communicate or attempt to communicate by telephone); *Joffe v. Acacia Mortg. Corp.*, 211 Ariz. 325, 329-30, 121 P.3d 831 (2005) (TCPA violation requires only that call is placed and does not require real-time, two-way intercommunication).

We conclude that the TCPA does not require that Taranto successfully completed a fax transmission but only that Taranto attempted to complete a fax transmission. It will be unnecessary for plaintiffs to prove that they actually received the transmissions, and this is not an issue that will defeat commonality.

If some members of the class are later determined to have consented to the transmission of the fax advertisements, those members may be removed. See, *e.g.*, *Blitz v. Aegean, Inc.*, 677 S.E.2d 1, 10 (N.C. App. 2009) ("The possibility that some proposed class members will later be removed should not *automatically* defeat class certification."); *Display South v. Graphics House Sports Pro.*, 992 So. 2d 510, 523 (La. App. 2008) (fact that some putative members of class would eventually be found to have consented to transmissions did not preclude certification).

*Superiority of Class Action over Other Options*

K.S.A. 2010 Supp. 60-223(b)(3) states that a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."

The district court found:

"Defendant argues that a class action is not a 'superior method' because 'certification would result in a due process violation given the potential for "horrendous, possibly annihilating punishment. . . ."' Defendant cites various cases involving inapposite statutes such as the Truth in Lending Act (TILA), Fair Credit Reporting Act (FCRA), Cable Communications Act, and the Fair Credit and Accurate Credit Transactions Act (FACTA) cases attempting to support its position. However, this Court finds defendant's argument premature. A determination of the constitutionality of an Act of Congress is not appropriate under in [*sic*] a

finding of class certification, but suffice it to say that this legal issue would be another common question of law for the Class.

"From the perspective of the court system, the class members, and the potential witnesses, a class action is a superior means of resolving the issues regarding Defendant's junk faxes, especially when compared to individual actions, because the maximum recovery for each class member is only $500 and the TCPA does not allow for fee shifting.

"Conclusion of Law: The court finds that allowing this class to proceed as a class action would be a superior use of judicial resources, and K.S.A. 60-223(b)(3) is satisfied. See Hinman, 208 WL 927910 at *4 ('resolution of the [TCPA] issues on a class wide basis, rather than in thousands of individual lawsuits would be an efficient use of both judicial and party resources')."

Other methods are available for adjudicating claims the proposed class seeks to litigate. One possible alternative to class certification is small claims court. See, e.g., Local Baking Products, Inc. v. Kosher Bagel Munch, Inc., 421 N.J. Super. 268, 280-81, 23 A.3d 469, (2011) (where damages under TCPA far exceed actual losses, aggrieved parties have incentive to prosecute separately in small claims courts); In Blitz v. Xpress Image, Inc., No. 05CVS679, 2006 WL 2425573, at *10 n.13 (N.C. Sup. Ct. 2006) (unpublished opinion) (quoting Senator Ernest Hollings of South Carolina suggesting small claims courts appropriate venues for TCPA violations).

Other courts have found that class action claims under the TCPA represent the superior remedy. See Sadowski, 2008 WL 2224892, at *5 (superiority requirement is satisfied in junk fax cases in consumer actions involving small individual claims because each member's damages too insignificant to provide incentive to pursue claims individually); Blitz, 677 S.E.2d at 10 (small claims courts cannot per se be superior venue for violations of the TCPA because they lack authority to grant injunctions); see also Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997) (policy at core of class action mechanism is to overcome problem that small recoveries do not provide incentive for individuals to bring solo actions to protect their rights).

We do not agree with the defendant's contention that over 100,000 individual small claims actions would be superior to a single class action. While the defendant in such an action might ben-

efit if only a small number of plaintiffs found it worth their while to bring suit or were aware of their rights under the TCPA, this small turnout would serve only to frustrate the intent of the TCPA and to protect junk fax advertisers from liability. It would, accordingly, not provide a "superior" method for individual plaintiffs. If, on the other hand, many thousands of plaintiffs elected to pursue their rights in small claims courts, those courts would be overwhelmed, plaintiffs would have to invest time and money in prosecuting their claims, and the defendant would have to appear in thousands of actions around this state and other states. See *Landsman & Funk PC v. Skinder-Strauss Associates*, 640 F.3d 72, 95 (3d Cir. 2011) (little reason to believe individual actions automatically efficient, and thousands of TCPA actions may be more efficiently brought as single class action).

The small claims alternative is contrary to the policy behind Federal Rule 23(b)(3), which the Kansas statute resembles. The United States Supreme Court has noted that "[w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high," the underlying policy of the class action mechanism is to overcome the problem that small recoveries provide little incentive for individuals to bring solo actions to protect their rights. *Anchem Products, Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).

Taranto argues that one way in which a class action is inferior to numerous individual actions is because of the threat of an "annihilating" judgment in favor of the class. This argument in essence informs the court that it has engaged in such widespread unlawful behavior that the court should give it special protection.

The court in *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 150 (E.D. Pa. 1976), rejected this kind of argument:

"[W]hether this suit proceeds as a class action or not, the law places joint and several liability upon the defendants for all injuries caused by any conspiracy of which they were members. The class action device merely provides a procedure for adjudicating the respective rights of the parties. If defendants' liability shocks the conscience, it is the fault of the substantive law which places joint and several liability on co-conspirators, not the class action. We refuse to hold that the extent of defendants' liability affects the superiority of the class action procedure in this case."

In *Samuel v. University of Pittsburgh*, 538 F.2d 991, 996 (3d Cir. 1976), the Third Circuit Court of Appeals found that the district court had abused its discretion when it considered the "irrelevant" factor of the financial hardship that a class action judgment would impose on the defendant as grounds for decertifying a class.

In *Circle v. Jim Walter Homes, Inc.*, 535 F.2d 583, 589 (10th Cir. 1976), the Tenth Circuit Court of Appeals reversed the denial of class certification that was based in part on the economic impact on the defendant. The court held:

"[T]he reason given by the court that the damages would be prohibitively high—or in his words, annihilating—is not a valid basis for refusal to certify. Conceivably the awards at this juncture may not include treble damages, but even if they do there is nothing in the record to indicate that this would prove to be annihilating. In any event, the damages flow from an unlawful trade practice—a practice prohibited by statute—and thus there is no basis for saying that the award is disproportionate to the magnitude of the violation."

If, as the plaintiffs allege, Taranto engaged in a widespread violation of the law, then class certification would fulfill a purpose of class action litigation. "[A]ggregate proof of the defendant's monetary liability promotes the deterrence objectives of the substantive laws underlying the class actions . . . ." 3 Newberg on Class Actions § 10:5, 487 (4th ed. 2002).

We conclude that the threat of catastrophic judgments should not protect parties that violate the law on a large scale and is not a relevant factor in determining whether a plaintiff class should be certified.

*Inconsistent Adjudications*

K.S.A. 2010 Supp. 60-223(b)(1)(A) establishes one of three alternative requirements for maintaining a class action lawsuit. This requirement is that either the prosecution of separate actions would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class, or that adjudications with respect to individual members of the class would as a practical matter dispose of or impair the interests of the other members who were not parties to the adjudications.

The district court determined that the requirements of K.S.A. 2010 Supp. 60-223(b)(1)(A) were satisfied because separate actions by individual class members might result in incompatible standards of conduct for Taranto. The court also held that two courts could reach inconsistent results on defenses such as express consent, established business relationships, or opt-out notice validity.

Taranto contends on appeal that the statutory inconsistent standards element refers primarily or exclusively to future conduct. Taranto cites *National Union v. Midland Bancor, Inc.*, 158 F.R.D. 681, 687 (D. Kan. 1994), holding that federal Rule 23(b)(1)(A), the federal equivalent of 60-223, requires more than the mere possibility that inconsistent judgments and resolutions of identical questions of law would result if numerous actions are conducted instead of one class action.

The *National Union* court quoted *Employers Ins. of Wausau v. Federal Deposit Ins.*, 112 F.R.D. 52, 54 (E.D. Tenn. 1986), holding that the risk of "incompatible standards of conduct" against which Rule 23(b)(1)(A) was designed to protect involves situations where the non-class party does not know, because of inconsistent adjudications, whether or not it is legally permissible for it to pursue a certain course of conduct and where it could be sued for different and incompatible relief.

While this conclusion has some basis in the plain statutory language, which refers to "incompatible standards of conduct," K.S.A. 2010 Supp. 60-223(b)(1)(A), the language may also be taken to mean that the class action establishes a standard of conduct that the non-class party is bound to follow, or it may refer to applying incompatible standards to past conduct.

The large number of potential plaintiffs in the present case could give rise to thousands of cases in a variety of courts, and the potential for inconsistent results is therefore great. This is the problem that the Missouri Court of Appeals addressed when it recently decided that class certification was the superior means of litigating a TCPA fax advertising suit:

"Class actions are designed to provide an 'economical means for disposing of similar lawsuits' while simultaneously 'protecting defendants from inconsistent obligations and the due process rights of absentee class members.' *State ex rel.*

*Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 860 (Mo. banc 2008) (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 402-03, 100 S. Ct. 1202, 63 L. Ed. 2d 479 [1980]). The underlying question in any class action certification is whether the class action device provides the most efficient and just method to resolve the controversy at hand." *Karen S. Little, L.L.C., v. Drury Inns, Inc.*, 306 S.W.3d 577, 583 (Mo. App. 2010) (affirming TCPA class certification).

The potential for inconsistent results lies most obviously in the question of damages. Under the TCPA, treble damages are available for "willfully" or "knowingly" violating the Act. The Louisiana First Circuit Court of Appeal found this provision sufficient to conclude that inconsistent results might follow in the absence of class certification:

"With the damages being so limited and defined in the statute, the possibility of inconsistent adjudications is not so likely in TCPA cases as in other types of claims that have been pursued as class actions. However, there is the possibility that one court might conclude that the actions of transmitters of faxes in violation of the TCPA were willful and knowing, justifying the imposition of punitive damages under the statute, while another court might find that precisely the same actions by the same defendant did not justify punitive damages. An early decision either imposing or denying such damages could, as a practical matter, be dispositive of the interests of other potential claimants who were not parties to that adjudication. Therefore, it is reasonable to pursue such claims in a class action . . . ." *Display South*, 992 So. 2d at 520.

We are persuaded that class certification in this case promotes the establishment of consistent standards for evaluating the defendant's conduct.

Taranto raises an additional argument related to its contention that the statutory scheme in play in this case is limited to prospective conduct: that K.S.A. 2010 Supp. 60-223(b)(1)(A) does not provide for monetary damages in the circumstances of the present case, because monetary compensation cannot be awarded for exclusively future conduct. Taranto cites *In re Dennis Greenman Securities Litigation*, 829 F.2d 1539, 1545 (11th Cir. 1987), which "reluctantly" took that position. The statutory language does not set out this policy, however, and courts have declined to apply the policy in an absolute fashion.

In *Turner v. Bernstein*, 768 A.2d 24, 33-34 (Del. Ch. 2000), the court rejected universal application of the *Greenman* reasoning.

The court noted that in certain kinds of litigation, the course of conduct would be the same with respect to all the defendants and that those defendants should reasonably expect consistent judgments:

"In *In re Dennis Greenman Securities*, the court held that it was improper to certify a class under Rule 23(b)(1)(A) because 'courts reason that inconsistent standards for future conduct are not created because a defendant might be found liable to some plaintiffs and not to others' and 'that if compensatory damage actions can be certified under Rule 23(b)(1)(A), then all actions could be certified under the section, thereby making the other subsections of Rule 23 meaningless, particularly Rule 23(b)(3).'

"*Greenman's* logic has some force as to the type of damage cases that frequently come to federal courts in class action clothing, particularly those diversity class actions that arise under state tort law. In such class actions, the individual circumstances of each class member are typically of material importance, and it is not infrequently the case that the substantive state laws governing class members' individual claims are widely disparate. But that logic does not apply to cases like this one. In challenges to corporate mergers brought on behalf of the stockholders not affiliated with the defendants, it is virtually never the case that there is any legitimate basis that 'a defendant might be found liable to some plaintiffs and not to others.' [*Greenman*, 829 F.2d at 1545.] Rather, the actions involve a challenge to a single course of conduct by the defendants that affects the stockholder class equally in proportion to their ownership interest in the enterprise.

"That such actions can be certified under Rule 23(b)(1)(A) hardly makes all claims for damages certifiable under that subsection. Rather, there remains an abundance of damage claims involving common *and* uncommon issues of law or fact that can be asserted on a class basis only by meeting the criteria applicable under the more flexible Rule 23(b)(3). In this respect, it is in reality the *Greenman* court's reading that is more likely to render a subsection of Rule 23(b) meaningless. By holding that a Rule 23(b)(1)(A) class can be certified only for claims for injunctive and declaratory relief, the *Greenman* court renders Rule 23(b)(1) largely redundant of Rule 23(b)(2), which expressly addresses injunctive and declaratory relief." 768 A.2d at 33-34.

We agree with the *Turner* reasoning, and conclude that monetary damages are appropriate under K.S.A. 2010 Supp. 60-223(b)(1)(A).

In *Merck & Co., Inc. Securities, Derivative & ERISA Litigation*, Nos. 05-1151, 05-2369, 2009 WL 331426, at *11 (D. N.J. 2009), the court noted that the principal authority underlying the proposition that certification under federal Rule 23(b)(1)(A) applies

only to prospective standards was *McDonnell Douglas Corp. v. U. S. Dist. Ct. C. D. of Cal.*, 523 F.2d 1083, 1086 (9th Cir. 1975), where that court held: "We cannot read subdivision (b)(1)(A) so broadly that subdivision (b)(3) applies only to class actions already maintainable under subdivision (b)(1)(A)." The court then further held:

"This is a far cry from the *per se* bar against 23(b)(1)(A) money damages cases that Defendants propose. . . .

"Furthermore, this position inserts a requirement into 23(b)(1)(A) that is not present. . . . Defendants fail to persuade that a class action case principally seeking money damages, but also seeking to establish a standard of conduct for Defendants, cannot qualify under 23(b)(1)(A)." *Merck & Co.*, 2009 WL 331426, at *11.

We conclude that the plain language of K.S.A. 2010 Supp. 60-223(b)(1)(A) includes standards of conduct for past behavior. This means that a district court, when evaluating class certification, may consider whether different courts might hold the parties to standards that are ultimately incompatible. An example of such a standard would be the extent to which a defendant's conduct was "willful" or "knowing" under 47 U.S.C. § 227(b)(3). The district court in the present case properly considered such factors in concluding that a class action would avoid inconsistent adjudications.

*Objectivity and Specificity of the Class Definition*

K.S.A. 2010 Supp. 60-223(c)(1)(B) requires that a certification order define the class and the class claims, issues, or defenses. Although the statute does not explicitly require that a class must be defined objectively and in terms of ascertainable criteria, notice requirements and due process mandate that it must be possible to determine from the class definition whether a particular individual is part of the class. See, *e.g.*, *Hamilton v. Ohio Sav. Bank*, 82 Ohio St. 3d 67, 72, 694 N.E.2d 442 (1998) (class description must be definite enough to determine whether particular individual is member).

The district court in our case adopted the following class definition:

"The end users of the fax numbers to which Defendant sent or caused to be sent, one or more facsimile transmissions advertising Defendant's products or seminars during the period from March 1, 2005 to March 1, 2008."

Taranto initially objects to the phrase "end users," which Taranto complains is nonsensical because it does not distinguish between the owner of a fax machine and all those people who make use of that fax machine. The plaintiff responds that the phrase clearly includes and is limited to the entities or people who purchased or leased the fax machines or fax-use time for their businesses or personal interests; the definition, according to the plaintiff, would not include individual employees of a business that leased a fax machine.

A plaintiff is not required to allege the exact number or identity of the class members. *Holtzman v. Turza*, No. 08C2014, 2009 WL 3334909, at *4 (N.D. Ill. 2009). The class definition must nevertheless be precise enough to allow courts and parties to determine in advance of adjudication whether a party belongs to the class.

"Care should be taken to define the class in objective terms capable of membership ascertainment when appropriate, without regard to the merits of the claim or the seeking of particular relief. Such a definition in terms of objective characteristics of class members avoids problems of circular definitions which depend on the outcome of the litigation on the merits before class members may be ascertained . . . ." 2 Newberg on Class Actions § 6:14, pp. 614-15 (4th ed. 2002).

We agree with Taranto that the definition as worded is not sufficiently precise to determine which parties are included in the class. The phrase "end user" does not have a single, authoritative meaning. For example, Black's Law Dictionary 1683 (9th ed. 2009) defines it as: "The ultimate consumer for whom a product is designed." The phrase can be found in a wide variety of legal contexts, such as end user license agreements, which attempt to place use restrictions on final purchasers, typically of computer software. See, *e.g.*, *Mortenson Co. v. Timberline Software*, 140 Wash. 2d 568, 998 P.2d 305 (2000); see also *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 477 (N.D. Ill. 2009) (class definition of "end users" included only purchasers and not indirect purchasers).

The phrase also appears a number of times in Kansas statutes. See, *e.g.*, K.S.A. 2010 Supp. 2-1201(13); K.S.A. 55-1807(c)(4) ("end retail user" means "any consumer, person, firm or corporation who utilizes liquefied petroleum gas in Kansas"); K.S.A. 2010 Supp. 79-3401(q).

In the area of telecommunications, Kansas statutes distinguish between a service provider and an "end user." See K.S.A. 66-2011(a) ("As used in this section, . . . .[a]n 'internet service provider' means an entity that provides end user access to the internet."). K.S.A. 2010 Supp. 79-3673(f)(6), relating to sourcing rules for sale of telecommunication services, states "(6) 'end user' means the person who utilizes the telecommunication service. In the case of an entity, end user means the individual who utilizes the services on behalf of the entity."

Although nothing compels the application of this definition to the present case, it illustrates possible ambiguity in the definition of the class. Under this definition, there is the possibility of multiple plaintiffs stemming from one fax transmission—all individuals at a home or employed by a corporate entity, or any person who happens to "intercept" a fax advertisement by picking it up. See, e.g., J2 *Global Communications, Inc. v. Protus IP Solutions*, No. CV 06-00566, 2010 WL 1609965, at *3 (C.D. Cal. 2010) (fax transmissions may be intercepted by unintended recipients).

A class including such plaintiffs differs from what Critchfield explained to the court in its brief and in oral argument—that the class is limited to the owners or lessees of the fax machines. It is therefore impossible to determine from the class definition who is included in the class of "end users" of fax numbers.

This flaw is not, however, fatal to the class certification. A trial court retains the ability to modify a class at any time before final judgment. *Dragon v. Vanguard Industries*, 282 Kan. 349, 364, 144 P.3d 1279 (2006) (quoting *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1261 [10th Cir. 2004]; see also *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 877-78 (11th Cir. 1986) (although expansion of class after trial "should be viewed with caution," trial court did not abuse discretion by enlarging class after trial on merits when expansion "simply conformed to what had been proved at trial," and defendant made no showing of prejudice); 2 Newberg on Class Actions § 6:14, p. 619 (4th ed. 2002) (federal Rule 23 gives district court broad discretion to modify definition of class even after certification); 3 Newberg on Class Actions § 7:47, pp. 154, 159 (4th ed. 2002) (class rulings may be altered or amended

at any time before decision on merits; ability of court to reconsider initial class rulings is vital ingredient in flexibility of courts to realize full potential benefits flowing from judicious use of class actions).

Rather than reverse the certification as overly vague, we note the advantages that a class action may offer, including judicial economy and protection of consumers' rights, and direct the district court to modify the class definition to clarify which parties constitute the plaintiff class.

Taranto also reiterates its earlier argument that a party must actually receive an unsolicited fax before a violation of the TCPA occurs. Taranto then complains that the class definition makes no reference to the receipt requirement. As we determined earlier, receipt is not a statutory component of the unlawful conduct.

*Abuse of Discretion in Determining the Ultimate Merits of Taranto's Defenses During Class Certification*

Taranto presented evidence that some fax targets had consented to receiving fax advertisements and that additional fax targets had an established business relationship with Taranto. These are absolute defenses under 47 U.S.C. § 227.

The district court found that Taranto had presented no evidence of express prior consent to send the fax advertisements to the entities on the two lists, and, in fact, Taranto had never seen one of the lists and had not sought consent from the parties on the other list. The district court determined that even if, in individual cases, consent was given or an established business relationship existed, common questions predominated among the recipients of a mass broadcast. The district court found that the possibly small number of lawful transmissions would not defeat class certification for the many targets of the unlawful transmissions. Finally, the district court held, Taranto bore the burden of proving its affirmative defenses at trial, and it was improper to place the burden on the plaintiff to establish prior to class certification that the defenses would not apply to all class members.

Taranto complains on appeal that this finding determines the ultimate validity of the claims or defenses at issue, in violation of *Dragon I*, 277 Kan. at 780-81.

The text of the district court order does not demonstrate that the district court determined "the ultimate merits of Defendant's defenses," as Taranto alleges. The district court findings instead go to whether the affirmative defenses served to bar class certification, either by reducing the numerosity of the class or by creating highly individualized issues regarding each plaintiff. Evidence from discovery suggested that Taranto had not obtained widespread consent to send fax advertisements, that it had made no effort to limit its fax transmissions to established customers, and that it would be relatively easy to winnow out those plaintiffs with whom Taranto had an established business relationship. In short, the district court did not require the plaintiffs to prove their relationships with Taranto at the time of certification; the opportunity to present such proof will still be available to Taranto if the case proceeds to trial. If additional evidence demonstrates that class certification is inappropriate because of the affirmative defenses, the district court will have the discretion to decertify the class.

*The Adequacy of the District Court's Analysis of the Parties' Pleadings and the Statutory Requirements for Class Certification*

Taranto asserts that at least five errors in the class certification order demonstrate that the district court failed to consider adequately the arguments and the factual record. These errors include a purported misstatement of Taranto's argument relating to the K.S.A. 2010 Supp. 60-223(b)(3) superiority requirement; the failure to address certain authority and an argument that the potential damages could be excessive; the absence of any comprehensive, all-inclusive fax number list; a reference to a special master when none was involved with the case; and the adoption by the trial court of written findings submitted by the plaintiff.

In general, this court will not reverse on mere technical errors. Appellate courts disregard all mere technical errors and irregularities that have not prejudicially affected the substantial rights of the complaining party when the record shows that substantial justice was done by the order of the trial court. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (if there is no reasonable probability that error did or will affect outcome of trial in light of entire record, error is harm-

less). The appellate courts are to render judgment " 'without regard to technical errors and irregularities in the proceedings of the trial court.' " *State v. Denney*, 258 Kan. 437, 444, 905 P.2d 657 (1995) (quoting K.S.A. 60-2105). We are also disinclined to inquire into the mental processes of a factfinder, so long as the conclusions are legally sustainable. See *Kelly v. Kansas City, Kansas Community College*, 231 Kan. 751, 757, 648 P.2d 225 (1982) (citing *United States v. Morgan*, 313 U.S. 409, 422, 61 S. Ct. 999, 85 L. Ed. 1429 [1941]).

A district court is under no requirement to address explicitly every legal authority raised by a party, especially out-of-jurisdiction authority that is not binding on Kansas courts. In addition, our appellate courts have upheld the practice of adopting proposed findings submitted by a party and have ruled that such adoption does not constitute inherent error. See *Stone v. City of Kiowa*, 263 Kan. 502, 506, 950 P.2d 1305 (1997); *Ortiz v. Biscanin*, 34 Kan. App. 2d 445, 455, 122 P.3d 365 (2004).

The errors asserted by Taranto are technical in nature and do not undermine the district court's determination that class certification is appropriate in this case.

The decision of the district court is affirmed, and we remand with instructions to modify the class definition to clarify the parties consistent with the foregoing discussion.