NOT DESIGNATED FOR PUBLICATION

No. 113,591

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of T.M. JR.
Date of Birth:  XX/XX/2009,
A Child Under the Age of 18 Years.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN L. SLOAN, judge. Opinion filed April 15, 2016. Affirmed in part and reversed in part.

*Dennis J. Stanchik*, of Olathe, for appellant natural mother.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Overland Park, for appellant natural father.

*Shawn Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

*Kathryn Barker*, of Lawrence, guardian ad litem.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

*Per Curiam*:  Mother and Father appeal the termination of their parental rights to their son, T.M. Father claims the district court erred by not continuing the hearing until he was released from prison and given a reasonable time to reintegrate with his son. Father also claims the district court failed to properly investigate his request to fire his court-appointed attorney—on the first day of the termination of parental rights trial— after the district court denied his motion to continue the trial until his release from prison. Mother claims the district court erred in finding she had not progressed sufficiently under her reintegration plan to stop the termination of her parental rights.

1

Given our standard of review, we find the district court did not err in terminating Father's parental rights, especially given his conviction for physically abusing T.M. When we consider the evidence presented in reference to Mother's parental rights, we see Mother has dramatically transformed herself during the proceedings from an abused 18-year-old mother to a college-attending mother of three children (two in her custody). The district court erred in finding there was clear and convincing evidence to support the termination of her parental rights. Finally, we find the district court did not err in denying Father's untimely motion to continue the trial or replace his attorney on the morning the termination of parental rights trial was set to start. Affirmed in part and reversed in part.

FACTS

T.M. was born in 2009. Mother was only 17 years old when she became pregnant. Father was physically abusive to Mother prior to T.M.'s birth and afterward. The record reflects Father was arrested at the University of Kansas Medical Center after pushing Mother to the floor during an argument over which of their mothers would be first to see T.M.'s sonogram picture. Mother also testified at the termination trial that when she was approximately 7 months pregnant with T.M., Father choked her during an argument.

After T.M. was born, he initially lived with Mother in her parents' house; however, Mother testified that when T.M. was 6 weeks old, Father convinced her to allow his mother to watch T.M. while they ran some errands. While they were out, Father informed Mother he wanted to end their relationship. Mother testified she immediately asked Father to take her to pick up T.M.; however, Father refused. Mother testified she jumped into Father's car and demanded to be taken to her son. Father started to drive away but quickly reached over and pushed her from the moving vehicle. Father then denied her access to T.M.

The record is unclear what happened next, but it appears Father contacted the police claiming Mother had battered him. He initiated a legal action of some sort and obtained a restraining order against Mother giving him custody of T.M. When asked at the termination hearing why he had obtained a restraining order against Mother, Father testified he could not remember why he had obtained the order or even if Mother had ever abused him. Father testified that despite the restraining order, between September 2009 and February 2010, he still allowed Mother to regularly babysit T.M. when he was at work.

In February 2010, Mother became concerned for T.M.'s welfare. She witnessed Father attempting to breastfeed T.M. Mother fled with T.M. to Ohio where she intended to live with her paternal grandmother, establish residency, and initiate custody proceedings. However, Mother returned to Kansas with T.M. the following month at the urging of her parents. Mother's parents had been contacted by the Wyandotte County Sherriff's Department who informed them Mother would face felony charges if she did not immediately return to Kansas.

At trial, Mother testified the morning after she returned from Ohio, Father arrived at her parents' home with officers from the Wyandotte County Sherriff's Department. With the assistance of law enforcement and an emergency order, Father regained custody of T.M. Again, the record is unclear, but based on Mother's testimony, it appears that after she returned to Kansas, a trial was held on custody at which she was given supervised visitation. After the supervised visitation order became effective, Father started allowing Mother to see T.M. at his home in addition to her allowed supervised visitation. The custody order is not in the record on appeal.

Mother also testified she witnessed Father physically abusing T.M. in April 2011. Mother could hear T.M. crying and the sound of the belt striking him. After Father finished administering the beating, he instructed Mother to give the child a bath. During

the bath, she noticed a mark over T.M's eye and that his bottom "did not look correct." Mother testified she immediately called the child abuse hotline maintained by the Kansas Department for Children and Families (DCF). It appears DCF investigated the incident but no action was taken.

Due to suspected severe child abuse, T.M. was taken into temporary DCF custody on June 26, 2012. The district court found it was contrary to T.M.'s welfare for T.M. to remain in or return home to Father due to concerns of continued abuse. Father was charged with child abuse for the intentional torture of T.M. Father's girlfriend had witnessed him repeatedly kicking and punching T.M. in the stomach and beating him with a belt. Subsequently, Father pled no contest and was sentenced to 31 months' imprisonment in Johnson County District Court case No.12 CR 1662.

T.M. was adjudicated as a child in need of care in a combined adjudication and disposition order dated September 24, 2012, based on K.S.A. 2015 Supp. 38-2202(d)(l)-(3). The district court's dispositional orders approved separate reintegration plans for each parent and established a 3-month reintegration period for both plans. On December 10, 2012, the district court extended the reintegration period for each parent for an additional 90 days.

By April 2013, the permanency goal in the case had changed from reintegration to permanent custodianship. The order notes the parents had consented to a permanent custodianship. However, the journal entry on the permanent custodianship makes clear the parental consent was limited to an appointment of the maternal grandparents as permanent custodians.

On April 23, 2013, the State filed a motion for a finding of unfitness and the termination of parental rights or the appointment of a permanent custodian. The motion was not heard by the district court until February 4 and 5, 2015—almost 2 years later.

4

Prior to the start of trial, Father's counsel requested a continuance because Father had just been sentenced in his criminal case, and was expected to remain in custody for 22 to 23 months. Father argued his sentence had been appealed, and that his appeal might affect the foreseeability of reintegration. The State opposed the request noting the matter had been set a number of times and a continuance during the pendency of Father's criminal appeal would not be in the best interests of the child. The guardian ad litem and counsel for Mother agreed with the State. The district court denied Father's request for a continuance.

Father then asked through his attorney to address the district court personally. Father asked the district court if he was entitled to the continuance, and the district court informed him that it had just denied the request and "we are having a trial today." Father then asked if he was allowed to relieve his counsel and obtain new counsel. His request was denied.

At the trial on the termination of parental rights, Doug Hickman, a former Kaw Valley Center (KVC) case manager, testified regarding Father's and Mother's individual progress toward reintegration. During the time T.M. had been in the custody of DCF, five separate KVC employees functioned as T.M.'s case manager. Hickman was the last KVC employee assigned to the case prior to trial who had interacted with Father and Mother. At the time of trial, Hickman no longer worked for KVC. Hickman testified that when he was assigned T.M.'s case, T.M. had been in DCF custody for about 10 months. Both parents' reintegration plans had been over for 30 days. He offered to meet with both parents to review their reintegration status; however, Hickman testified only Mother met with him.

*Mother's Progress on Reintegration Plan Tasks*

At the meeting, Hickman and Mother discussed her compliance with the case plan requirement that she maintain stable and adequate housing. Mother had provided a copy of a lease to a previous case manager, but the lease had expired 2 months before the meeting. Mother informed Hickman she was still living in the apartment described in the lease on a month-to-month holdover lease. Mother testified at trial she still lives in the same apartment. Hickman and Mother also discussed her financial circumstances. Hickman informed Mother she needed to provide proof of employment in the form of paycheck stubs and completed budget forms. During all relevant times, Mother was attending college at Kansas City Community College, majoring in criminal justice. The record reflects she had completed 29 of the required 64 hours at the time of the hearing.

According to Hickman, at the time he left KVC, Mother had completed the following reintegration tasks—the psychological evaluation and the required parenting class. When asked to list the significant changes Mother needed to make before being allowed to progress toward reintegration, Hickman responded:

> "Had I seen more completion of tasks such as being able to go to the home, knowing that she had secure housing which she did not in my mind have because there was no stable lease. It took a long time to get verification of insurance to do transportation, so she had to rely on her parents for that. Addressing concerns that she brought up in her report of—her psychological report about her trauma history. Those were the main concerns."

In later testimony, Hickman testified Mother's inconsistent visitation attendance for 3 months was a cause for concern and a reason for not expanding the visitation schedule. Hickman stated he had not seen "any proactive almost aggressive effort to retain custody." Finally, Hickman testified that failure to protect T.M. from abuse by Father was the main concern he had with Mother. When asked to identify specific facts

upon which he based this concern, Hickman identified Mother's self-reporting she had previously been afraid of Father and she continued to be fearful and anxious he might continue trying to manipulate her in the future. When asked whether his opinion about Mother's failure to protect T.M. might change if he knew she had previously reported Father to DCF, Hickman testified the information would have some bearing on his opinion.

Sheri Rice, the court-appointed special advocate (CASA) worker assigned to the case, also testified she had concerns about Mother's ability to protect T.M. from Father's abusive conduct. Rice testified she did not have many interactions with Mother because Mother was not in the picture. T.M. did not go over to Mother's house. Mother would visit when T.M. was at his maternal grandparents' house, but Rice had never stopped by when she was there. Rice did observe supervised visits with Mother and did testify to some concerns about Mother being a "laid back person." Rice testified that at one appointment, Mother was on her phone a lot while playing with T.M. Rice felt Mother wanted to be T.M.'s friend and had trouble setting boundaries.

Rice testified she was not sure whether Mother would have the courage to keep Father from seeing T.M. when he got out of prison. The only details Rice offered for this concern were a series of text messages Mother received from Father during which he asked whether she was going to receive custody of T.M. Hickman testified Mother had disclosed these text messages as they were received.

*Father's Progress on Reintegration Plan Tasks*

Regarding Father's progress on his reintegration plan, Hickman testified that while Father had provided a 1-year lease to KVC, that lease had expired, and Father was currently in prison. Prior to imprisonment, Father had provided proof of employment and completed the required batterer's intervention assessment and parenting classes. Father

7

had failed to comply with the reintegration plan requirement for an additional psychological assessment and individual therapy.

Father's compliance with the reintegration plan for visitation was terminated for inappropriate behavior. Hickman testified Father had a no-contact order, but he was offered therapeutic visitation with T.M. and initially complied with the therapist's visits. These visits were stopped when Father alleged professional misconduct against the therapist supervising his parental visitations. Hickman acknowledged Father repeatedly asked to visit his son; however, the therapist did not feel it was in T.M.'s best interests. Additionally, the reintegration plan required Father's criminal case be resolved.

Hickman testified at the termination trial that reintegration with Father was inappropriate because of Father's pending criminal case for child abuse involving T.M., the no-contact order, and because nothing had really changed since the original petition. Hickman noted that Father's situation was unlikely to change with his recent sentence and incarceration.

As Father points out, Hickman did testify Father refrained from using corporal punishment, used appropriate language around the child, and maintained an environment free of domestic violence during his initial supervised visits. However, Hickman also testified KVC was forced to get a no-contact order against Father because he was extremely threatening; Father was not allowed to talk to Hickman without his lawyer being present.

The State also called Meredith Keller, an outpatient therapist licensed at the clinical level and employed by KVC, to testify to T.M.'s emotional state. In Keller's opinion, T.M. exhibited behaviors indicative of prior disrupted attachments. Because she had not worked with Mother, Keller could not state that Mother should be ruled out as the permanent caregiver with whom the attachment process could continue.

The State's final witness was Anne Kwon, the KVC case manager assigned to the case after Hickman left the KVC. Kwon had only two encounters with Mother—once after a court hearing and once at a review for case planning. Kwon offered her opinion that adoption would be in the best interests of the child because (1) adoption would provide a subsidy that might assist the maternal grandparents with budget issues; and (2) termination of Father's parental rights would ease the concern of the maternal grandparents as to Father's future attempts to become involved with T.M.

The district court concluded the evidence clearly and convincingly established Mother was unfit to parent T.M. pursuant to K.S.A. 2015 Supp. 38-2269(b)(7); K.S.A. 2015 Supp. 38-2269(b)(8); K.S.A. 2015 Supp. 38-2269(c)(2); and K.S.A. 2015 Supp. 38-2269(c)(3). The district court found Father was unfit pursuant to K.S.A. 2015 Supp. 38-2269(b)(2); K.S.A. 2015 Supp. 38-2269(b)(4); K.S.A. 2015 Supp. 38-2269(b)5); and K.S.A. 2015 Supp. 38-2269(c)(3). The journal entry of judgment incorporated the remarks made by the district court during the pronouncement of its ruling from the bench.

The district court found Mother's and Father's unfitness was unlikely to change in the foreseeable future and that it was in T.M.'s best interests to terminate their parental rights. Mother and Father timely appeal.

ANALYSIS

On appeal, Mother and Father separately argue the district court erred when it found there was clear and convincing evidence the conditions rendering each parent unfit to care for T.M. were unlikely to change in the foreseeable future and the district court abused its discretion when it concluded terminating their parental rights was in T.M.'s best interests. Father separately argues the district court erred by not granting his request for a continuance to obtain new counsel to prepare for trial. We will begin with a brief

9

discussion on the controlling law and then discuss Father and Mother's issues individually.

*Did the district court err in terminating both parents' parental rights?*

*Standard of Review*

The Kansas Legislature has specified:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2015 Supp. 38-2269(a).

Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). An appellate court reviewing a determination which is required to be based upon clear and convincing evidence considers whether, after a review of all the evidence viewed in the light most favorable to the party with the burden of proof, it is convinced that a rational factfinder could have found the determination to be highly probable. In reviewing the factual findings, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010) (citing *In re B.D.-Y.*, 286 Kan. at 697, 705).

*K.S.A. 2015 Supp. 38-2269 Controls Termination of Parental Rights*

The Revised Kansas Code for Care of Children provides that the district court may terminate parental rights when a child has been adjudicated a child in need of care and

"the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2015 Supp. 38-2269(a). The statute lists nonexclusive factors the district court shall consider in making a determination of unfitness. K.S.A. 2015 Supp. 38-2269(b).

"(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;

(2) conduct toward a child of a physically, emotionally or sexually cruel or abusive nature;

(3) the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;

(4) physical, mental or emotional abuse or neglect or sexual abuse of a child;

(5) conviction of a felony and imprisonment;

(6) unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death;

(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

(9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply."

The district court shall also consider a separate list of nonexclusive factors when a child is not in the physical custody of the parent. K.S.A. 2015 Supp. 38-2269(c).

"(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:

11

(1) Failure to assure care of the child in the parental home when able to do so;

(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home; and

(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay."

Any one of the factors in K.S.A. 2015 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2014 Supp. 38-2269(f). "The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them." *In re M.H.*, 50 Kan. App. 2d 1162, 1170-71, 337 P.3d 711 (2014).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2015 Supp. 38-2269(g)(1). In making such a determination, the district court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2015 Supp. 38-2269(g)(1).

The State and T.M.'s guardian ad litem asked the district court to consider the following limited statutory factors when determining whether the natural parents were unfit:

1. K.S.A. 2015 Supp. 38-2269(b)(4), physical, mental, or emotional abuse or neglect or sexual abuse of the child;

2. K.S.A. 2015 Supp. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

12

3.      K.S.A. 2015 Supp. 38-2269(b)(8), lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the children; and because the children were not in the physical custody of the natural parents;

4.      K.S.A. 2015 Supp. 38-2269(c)(2), failure to maintain regular visitation, contact, or communications with the children or with the custodian of the children; and

5.      K.S.A. 2015 Supp. 38-2269(c)(3), failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home.

Additionally, the State and T.M.'s guardian ad litem asked the district court to consider K.S.A. 2015 Supp. 38-2269(b)(5), conviction of a felony and imprisonment, when evaluating Father's parental unfitness.

*Natural Father*

After a thorough review of the evidence, the district court considered the parents separately. The district court found that at the time of trial, Father had failed to complete his reintegration plan and that he was unfit as follows:

> "He is unfit pursuant to K.S.A. 38-2269(b)(2) based upon his conduct towards his son which was physically and emotionally cruel and abusive. He is unfit pursuant to K.S.A. 38-2269(b)(4) based upon his physical, mental and emotional abuse of his son. He has been found guilty of severely abusing his little boy. [Father] is unfit pursuant to K.S.A. 38-2269(b)(5) based upon his conviction of a Level 5 person felony against his own son and his 31 month sentence of incarceration. He is unfit pursuant to K.S.A. 38-2269(b)(8) and (c)(3) based upon his lack of effort to adjust his circumstances and his failure to complete a reintegration plan."

13

The district court found Father's unfitness was unlikely to change in the immediate or foreseeable future. In making this finding, the district court referenced the State's Exhibit 1, a letter from T.M.'s therapist, Meredith Keller, as follows:

"In her letter Ms. Keller notes one, [T.M.] was removed from his father's home due to allegations of physical abuse and neglect by his father. Those allegations were substantiated by DCF. Two, at the time he was removed from his father's care, [T.M.] had not received consistent medical care contributing to his being underweight, a severe speech delay and issues with both of his ears. He also had numerous physical injuries. Three, the severity of the allegations between T.M. and his father resulted in a no contact order for [Father]. Four, [Father] was allowed therapeutically supervised contact with his son beginning in January 2013. The therapist stopped contact after five visits due to concerns regarding [Father's] behavior. The last contact was March 31st, 2013. Five, [Father] has not acknowledged his role in his son's removal from the home, nor has he accepted responsibility for his actions. He has not acknowledged issues with self-control, anger management or domestic violence. He is not participating in treatment."

The court made the following additional findings:

"The Court notes that [Father] is going to be incarcerated for a significant period of time. His appeal while not yet docketed could take the better part of a year to determine if he prevails or not with regard to his sentencing. However, in addition [Father] has had almost three years worth of time to show something—to show to someone that he might change in the future. He has never taken full responsibility for his son. Instead he has been unapologetic and defensive. [Father] is a child abuser and the evidence showed him to also be a perpetrator of domestic violence. He is controlling and was even occasionally surly during trial. The past is prologue, and [Father]'s serious conditions of unfitness, his abusive behavior towards his little boy for which he was charged back in 2012 and has now been found guilty, his inability to complete a reintegration plan offered three years ago and his clear lack of remorse demonstrates to this Court that his conditions of unfitness are not likely to change in the immediate or foreseeable future."

Any one of the factors in K.S.A. 2015 Supp. 38-2269(b) or (c) may establish grounds for termination. There is overwhelming evidence to support the district court's findings. Father was convicted of a felony involving physical harm to T.M. and is currently serving his sentence. That alone is sufficient to find him unfit under K.S.A. 2015 Supp. 38-2269(b)(5). Additionally, the evidence was overwhelming that Father was abusive and, as of the time of trial, refused to acknowledge his documented history of domestic and child abuse. A rational factfinder could find it highly probable Father was unfit and that his unfitness was unlikely to change in the foreseeable future.

The district court did not abuse its discretion in finding termination of Father's parental rights was in T.M.'s best interests.

"Even after finding unfitness that is unlikely to change in the foreseeable future, a court must also determine that terminating the parent's rights is in the child's best interests before it can terminate those rights. K.S.A. 2013 Supp. 38-2269(g)(1). In making the best-interests determination, the court gives primary consideration to the child's physical, mental, and emotional needs. K.S.A. 2013 Supp. 38-2269(g)(1).

"The determination of what is in a child's best interests is inherently a judgment call, so we review the decision for abuse of discretion. *In re R.S.*, 50 Kan. App. 2d ___, Syl. ¶ 2, 336 P.3d 903 (2014). A district court abuses its discretion only when it bases its decision on an error of fact or law or when its decision is so unreasonable that no one would agree with it. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011); *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* [132 S. Ct. 1594]." *In re M.H.*, 50 Kan. App. 2d 1162, 1175, 337 P.3d 711 (2014).

Father argues the district court abused its discretion by not allowing him time after his release from incarceration to reintegrate. There was no abuse of discretion. A reasonable person could find T.M. deserves permanency and should not have to wait for Father to serve his sentence for child abuse and then try to obtain another chance for reintegration. The district court did not err by terminating Father's rights.

15

*Natural Mother*

The district court found that as of time of the trial, Mother had failed to complete her reintegration plan and was unfit as a parent because:

"The Court finds that the evidence is clear and convincing that [Mother] is unfit as a parent. The Court finds her unfit pursuant to K.S.A. 38-2269(b)(7) because there were numerous and reasonable efforts utilized by KVC and DCF that were unsuccessful in rehabilitating the family. She is unfit pursuant to K.S.A. 38-2269(b)(8) and (c)(3) based upon her lack of effort to adjust her conduct, conditions and circumstances to meet the needs of her son and her failure to complete the reintegration plan offered to her. [Mother] is unfit pursuant to K.S.A. 38-2269(c)(2) based upon her failure to maintain regular visitation, contact and communication with her son for three or four months straight. In addition the Court notes that for the 90 days since the trial was set, the mother was less than proactive in trying to set up visits with her son."

The district court found Mother's unfitness was unlikely to change in the immediate or foreseeable future.

"[Mother's] conditions of unfitness are also unlikely to change in the immediate or foreseeable future. She too has had close to three years to show a degree of energy and commitment to her son. She has not. Her son came into State custody because his father was abusing him. [Mother] did not protect her son. Not once has she demonstrated the mother bear instinct to protect or fight for her son. She and she alone could have come to trial prepared to show that she in fact completed the tasks on her reintegration plan which technically expired in March 2013. No one has ever suggested that she stop trying.

"She just moved on. She had other children. She has never fought for [T.M.] She had an inordinate amount of time to complete a reintegration plan regardless of its expiration date. She decided to consent to a permanent custodianship. Even after questions arose as to the viability of a permanent custodianship with her own parents, she sat by and did nothing.

"Again as to [Mother] the past is prologue. Her conditions of unfitness are not likely to change in the foreseeable future. [Mother] is weak and passive. She has not been

16

protective throughout the course of her son's case. Almost three years' worth of passivity during the case itself as well as her lack of ability to protect her son before he came into custody, demonstrates the clear unlikeliness to change in the future."

In reviewing whether there was clear and convincing evidence Mother was unfit in the light most favorable to the State, it is a very close call. First, we turn to the evidence supporting the district court's finding of unfitness pursuant to K.S.A. 2015 Supp. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family and K.S.A. 2015 Supp. 38-2269(c)(3), failure to carry out a reasonable plan approved by the court directed toward the reintegration of the child into a parental home.

Hickman's testimony lacks conviction that he understood his job was to help with reintegration. Instead, the record reflects Hickman misinterpreted the reintegration plan as he applied it to Mother. Hickman testified Mother failed her reintegration plan by not providing stable housing because her lease had expired and she was now on a month-to-month holdover lease; however, the record reflects Hickman knew Mother had lived in the same apartment for 2-1/2 years. The record demonstrates Hickman did not understand the legality of a holdover lease and, thus, penalized Mother despite knowing she had been demonstrating stability by living in the same apartment for 2-1/2 years. Hickman also testified he knew Mother had two children after T.M. and he had no concerns about those children being in her custody and living in her apartment.

Hickman claimed Mother failed to provide KVC with a budget showing paycheck stubs. This alleged failure seems unreasonable when the record reflects Mother was enrolled in college and, as of the time of trial, was supported by a combination of grant money and state financial assistance. Mother did not have paycheck stubs to give Hickman. Hickman knew Mother was in college, but stated: "Typically whether they are enrolled in college is not a determining factor for reintegration, so it was not on the reintegration plan as a priority." Hickman did not consider Mother's enrollment in college

17

in determining Mother's progress. He testified he was concerned about Mother's unemployment; however, again, during the time T.M. was in DCF's custody, Mother was enrolled in college and was half way through completing her degree in Criminal Justice at Kansas City Community College.

Finally, Hickman testified Mother had failed her reintegration plan because there was a 3- to 4-month period when she did not see T.M.; however, Mother testified this was due to a change in T.M.'s schedule that interfered with her college class schedule and that it took time to arrange a schedule that worked with Hickman. When asked why Mother's reintegration plan had never progressed despite Mother's efforts, Hickman testified Mother was just not proactive and KVC stopped working on attempting to reintegrate her once the goals shifted to a permanent guardianship. Again, Hickman's lack of knowledge about progress in this case is demonstrated by the following questions and answers in the trial transcript:

> "[Berry:] But based upon your testimony as case manager, you haven't been on this case for how many months?
> "[Hickman:] It has been almost six.
> "[Berry:] So, you don't know whether there has been any progress, then; correct?
> "[Hickman:] Right, I can't speak to that."

It is highly probable that a reasonable factfinder would conclude the State failed to produce clear and convincing evidence Mother had failed the reintegration plan.

Next, the district court found Mother was unfit pursuant to K.S.A. 2015 Supp. 38-2269(b)(8) because of a lack of effort on her part to adjust her circumstances, conduct, or conditions to meet the needs of T.M. The district court appeared to make this finding because of her weak and passive personality. We cannot find clear and convincing evidence to support this finding. The testimony at trial clearly reflects when Mother started her reintegration plan, she was a battered teenager. She is now going to college, is

18

halfway through her degree program, and is successfully raising two other children. Since this proceeding started, Mother has obtained a vehicle and lived in the same apartment for 2 1/2 years. Both Hickman and Rice testified their biggest concern was Mother's inability to protect T.M. in the future from Father based on her past conduct.

"[Stanchik:] Mr. Hickman, am I to understand that you are telling this court that given the information available to you that you have gained during the course of your duties as case manager in this case, you have a serious concern about my client's failure to protect [T.M] from any abusive conduct on the part of his father?

"[Hickman:] Yes.

"[Stanchik:] And you're basing that concern on what exactly? What facts do you have that gave rise to that concern?

"[Hickman:] Just her report of being previously afraid, knowing the history of the domestic violence.

"[Stanchik:] So she reported to you she is afraid and has been afraid of him in the past. What in that fact gives you rise to think that she might fail to protect her child from the man?

"[Hickman:] Her continuing to be afraid and worried that he would try to manipulate her, control her and—

"[Stanchik:] Do you have any evidence?

"[Miller:] Judge, I am going to have to object. He isn't letting the witness finish the question. He is asking open-ended questions and then not letting the witness finish.

"THE COURT: Let's let each other finish.

"[Stanchik:] I apologize.

"[Hickman:] She was concerned about and I was, too, her—because she had self-reported having concerns in the past, the history of the domestic violence and just whether or not if he did come, what she would do.

"[Stanchik:] So she came to you and she told you I am afraid of him. I am still afraid of him. Is that fair?

"[Hickman:] Yes.

"[Stanchik:] She came to you and asked you what should I do if he comes to me in the future. Is that fair?

"[Hickman:] Yes.

19

"[Stanchik:] Do you have any evidence that would allow you to reasonably conclude that she had in fact failed to protect her child at any time from [Father's] behaviors?

"[Hickman:] Just again her self report would be the only justification.

"[Stanchik:] Okay. She never said to you, I knew about abuse and I didn't report it?

"[Hickman:] She reports she did not know about the abuse, but she did disclose that she knew he would get a whooping occasionally as part of what she understood to be standard discipline."

They failed to acknowledge what Mother had done given her limited resources. She was attempting to leave an abusive relationship, was very young, and had been denied custody of T.M. Despite that, Mother did her best to protect T.M. She reported Father's abuse to DCF and testified against him at his trial. When T.M. was a baby, Mother even went so far as to flee the state with T.M. to protect him from Father. There was not clear and convincing evidence for a rational factfinder to find Mother had failed to adjust her circumstances or that she would be unwilling or unable to protect T.M. in the future when Father was released from prison.

Finally, the district court found Mother was unfit pursuant to K.S.A. 2015 Supp. 38-2269(c)(2), for failing to maintain visitation for a period of 3 months. Even when viewed in the light most favorable to the State, it is still unlikely a rational factfinder would find it highly probable Mother was unfit due to her limited parental visits for a single 3-month period 2 years before the termination hearing. There was testimony from both KVC and Mother that during this time period she was trying to arrange visitation; however, due to T.M.'s various therapy appointments and Hickman's schedule it took time to arrange visitation. It was not as if Mother simply disappeared for 3 months. The evidence reflects Mother was going to college and was trying to work with Hickman and KVC to arrange her visitation. The evidence is not clear and convincing Mother was unfit for failing to maintain visitation.

20

Even if there was clear and convincing evidence Mother was unfit, there was not clear and convincing evidence this was unlikely to change in the foreseeable future. Throughout the trial, there was never any evidence presented that Mother had been physically or emotionally abusive to T.M. The testimony at trial showed Mother had transformed from a battered teenager to a 23-year-old enrolled in college who was successfully raising two other children with reasonable transportation in stable housing. The evidence shows Mother is making steady changes to improve her life. Additionally, the district court improperly found Mother lacked sufficient "mother bear" instincts. That is an error of fact. Mother took T.M. out of the state to protect him and was forced to bring the child back under the threat of a felony charge. Additionally, Mother turned Father into DCF for child abuse, DCF investigated the accusations, and did nothing until Father's new girlfriend turned him in for harming T.M. The district court incorrectly applied the "mother bear" test in its findings. It is not highly probable a rational factfinder would be convinced Mother was unfit and that the unfitness was unlikely to change. While we recognize our standard of review is very deferential to the findings of the district court, the record reflects the court erred in terminating Mother's parental rights.

*Father's Untimely Motion for Continuance*

K.S.A. 22-3401 provides a district court may grant a continuance "for good cause shown," and its refusal to grant a continuance will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Lewis*, 299 Kan. 828, 846, 326 P.3d 387 (2014). An abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. *State v. Dobbs*, 297 Kan. 1225, 1232, 308 P.3d 1258 (2013) (request for continuance); *State v. Ardry*, 295 Kan. 733, 736, 286 P.3d 207 (2012).

On appeal, Father argues the district court violated his right to counsel under the Sixth Amendment to the United States Constitution by requiring him to proceed to trial while represented by appointed counsel with whom he had developed a conflict.

> "'A trial court's refusal to appoint new trial counsel is reviewed using an abuse of discretion standard. Judicial discretion is abused when the district court's action is arbitrary, fanciful, or unreasonable. The test for abuse of judicial discretion is whether any reasonable person would take the view adopted by the district court. *State v. Jasper*, 269 Kan. 649, 653, 8 P.3d 708 (2000).
>
> "'To warrant the appointment of new trial counsel, a defendant must show "justifiable dissatisfaction" with his or her appointed counsel. "Justifiable dissatisfaction" may be demonstrated by showing a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the defendant and his or her appointed attorney. *Jasper*, 269 Kan. at 654, 8 P.3d 708.' *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006)." *State v. Crum*, 286 Kan. 145, 158, 184 P.3d 222 (2008).

Prior to the start of trial, Father's counsel requested a continuance until Father's appeal on his criminal matters was concluded. The request on the day of trial for the reason given was unreasonable and included no reference to any attorney/client conflict. When the request was denied, Father asked for permission to address the court personally, which was allowed. After asking if he was entitled to a continuance and being told no, Father asked the district court to relieve his counsel and appoint new counsel, the following exchange occurred:

> "The Court: I am going to find that isn't good cause to continue a trial at this last minute when Mr. Berry has represented you throughout these proceedings. On the eve of trial at 9:35 in the morning, an hour past when we were set to start, for you now to say that you don't want your attorney—I don't consider that good cause.
>
> "[Father]: Well, the good cause is because I need to be able to have my case and I don't feel like Mr. Berry is representing me in a way that can help me with my case. I feel like I need better counsel.

"The Court: [Father], I am denying your request for a continuance. I have not heard any good cause for me to relieve Mr. Berry and to give you time to find another attorney that you like better. Your request is denied. Have a seat.

"[State]: Judge, if I may. I just ask for -- I just ask for some clarification that the Court is not finding any type of justifiable dissatisfaction that [Father] would have with Mr. Berry before we begin.

"The Court: Thank you for that clarification. I am in fact based on what I heard finding there is no justifiable -- I have not heard any justifiable dissatisfaction to justify replacing Mr. Berry."

While the district court should have inquired more as to why Father wanted new counsel, it appears Father was given the opportunity to state why he felt there was good cause. It does not appear there was a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the defendant and his appointed attorney. The record reflects that on the day of the trial, Father wanted to fire his attorney as an excuse to obtain a continuance of the trial until he was released from prison on his criminal sentence of child abuse. The district court did not abuse its discretion in denying Father's request for a continuance.

Father again asked for new counsel prior to the district court's ruling on March 9, 2015, from the bench. The following exchange occurred:

"[Father]: Last time I came to court which I think was on the 4th of February, I asked to terminate my lawyer because of ineffective counsel and you denied that. I would like to still terminate my attorney.

. . . .

"THE COURT: I am not even sure how to address you. I understand. I am getting ready to rule right now.

"THE FATHER: Okay.

"THE COURT: You can go ahead and have a seat."

23

While the district court did not address why Father wanted to terminate his counsel, it does not appear to be an abuse of discretion. The trial was over and the parties were gathered to hear the ruling. Father makes no allegation his attorney's representation during the trial was ineffective before the district court or in his brief on appeal. The district court's decision to deny Father's request was not arbitrary, unreasonable, or fanciful. There was no abuse of discretion.

Affirmed in part and reversed in part.