NOT DESIGNATED FOR PUBLICATION

No. 118,650

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of M.G.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed August 10, 2018. Affirmed.

*Christian Webb*, of Olathe, for appellant.

*Jacob M. Gontesky*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM:  E.G. (Father), the natural father of M.G., appeals the trial court's termination of his parental rights after concluding that his unfitness was unlikely to change in the foreseeable future. On appeal, Father maintains that there was insufficient evidence for the trial court to terminate his parental rights. Father also argues that he had made progress sufficient to warrant more time to reintegrate with his child. Based on clear and convincing evidence, we determine that the trial court properly concluded that Father's conduct or condition was unlikely to change in the foreseeable future and that it was in the child's best interests to terminate Father's parental rights. Accordingly, we affirm.

1

*Factual and Procedural Background*

M.G. was born on April 29, 2014. Father is M.G.'s natural father. M.G.'s natural mother, K.R., relinquished her rights to parent M.G. in February 2016, and K.R.'s parental rights are not at issue in this appeal.

When M.G. was only one month old, she was temporarily placed in the custody of the State of Kansas. On June 3, 2014, M.G. was placed with her foster parents, Patricia and Kirby W. The State initiated M.G.'s temporary placement because of concerns with K.R.'s mental health and with her drug use during pregnancy. In addition, the State had concerns about Father's criminal convictions.

In July 2014, Father conceded to the allegations against him in a child in need of care (CINC) petition. As a result, the trial court adjudicated M.G. as a CINC. The trial court then granted Father a three-month reintegration plan. While the plan was in effect, Father was charged with domestic battery against K.R. and served a jail term.

In August 2015, the trial court held that Father had not satisfied the goals set out in his reintegration plan. The trial court also found that reintegration was no longer a viable goal and that either adoption or permanent custodianship might be in M.G.'s best interests. Then in July 2016, the trial court found that Father was making progress in his reintegration plan and allowed Father to visit M.G., but it still required that M.G. remain in State custody.

A trial was held in January 2017. The trial court began by taking judicial notice of Father's conviction of domestic battery against K.R.

The State called Johanna Falls, who worked for the Kansas Department for Children and Families (DCF) as an investigator of child abuse and neglect.

2

Falls met M.G. and K.R. in the hospital when M.G. was only one day old. Falls testified that K.R. and Father never married but had been dating for roughly eight or nine months. Falls also testified that K.R. originally wanted to parent M.G. but had no place to live. As a result, she planned on living with her father and stepmother. K.R. also told Falls that Father refused to sign M.G.'s birth certificate and had encouraged K.R. to abort M.G. K.R. also revealed that Father had physically abused her, including choking her until she lost consciousness.

Falls learned on June 2, 2014, that K.R.'s parents had kicked her out of their home and that K.R. had no other place to live. As a result, Falls filed a CINC petition on June 3, 2014, and the State took M.G. into custody on that same day. Although Falls testified that she made no attempt to contact Father, she explained that no such obligation existed because there was no known paternal relationship between M.G. and Father. Falls also testified that Father never contacted DCF and never filed a petition to establish his parental rights.

Margaret Swayze, M.G.'s court-appointed special advocate, also testified that out of the six or seven visits between Father and M.G. that she supervised, M.G. never became comfortable and remained fearful of Father; M.G. would cry throughout the hour long visits. Swayze testified that M.G. did not exhibit the same behaviors in her foster home or daycare. Swayze also testified that she thought Father's failure to regularly attend visits was the leading cause of M.G.'s discomfort with Father. Swayze also did not believe unsupervised visits with Father would be healthy for M.G.

K.R. testified that she and Father had an on-and-off-again relationship that ultimately ended when Father became upset about her pregnancy. Father requested that K.R. get an abortion. According to K.R., the day she gave birth to M.G., Father was in the hospital but refused to sign the birth certificate.

3

K.R. testified that Father had previously physically abused her. On one such occasion, Father choked K.R. until she lost consciousness. While pregnant, Father physically abused K.R. until she required hospitalization on four different occasions. K.R. described two of these occasions:

> "[O]ne time he kicked me in my back and I landed on the sofa edge and my stomach hit it. Another time he dislocated my shoulder blade in the shower because he wanted to go out and drink with his friends. I told him . . . to stay at home and save money for the baby. He didn't care. So he would go out."

K.R. also testified that while she was pregnant, Father held her at gunpoint while also choking her and tried to run her over with his car. Eventually, K.R. filed a restraining order against Father.

Father was charged with domestic violence after an altercation with K.R. in September 2014. On that day, Father arrived at K.R.'s apartment and accused her of having sexual intercourse with her female friend. Father then punched K.R. in the face and tried to strangle her. He then spit in K.R.'s face, called her names, and told her to engage in a sexual act with her friend in front of him. Ultimately, Father was charged for the offense. While out of jail on bond, Father violated the no contact order against him and was charged with that offense as well.

K.R. testified that Father told her that he had stabbed a man to death when he was 17 years old, that he had enjoyed committing that crime, and that he would eventually kill again. K.R. also testified that Father tried to stab one of his brothers, whom Father was living with at the time of trial.

4

Christine Lenz, who was assigned as a KVC case manager to M.G.'s case in May 2015, testified that Father seemed to understand his reintegration plan and the tasks that he was required to accomplish. Furthermore, Father never suggested that he did not understand the reintegration process.

Lenz testified that Father participated in three visits with M.G. before he was incarcerated for the domestic violence offense against K.R. According to Lenz, Father was consistently late to his visits and M.G. did not receive him well; M.G. would cry throughout the visits. After his release from jail, Father attended eight visits before he was in a car accident which left him without a vehicle. Father attended zero visits from August 14, 2015, to December 15, 2015. During this time, Father also stopped taking his required urine analyses (UAs) and he failed to cooperate with the Interstate Compact for Placement of Children (ICPC) process.

Lenz further testified that as of April 2015, she received no proof of Father's progress in his reintegration plan, which had technically expired in October 2014. Father provided no proof of income or employment, suitable housing, transportation, mental health evaluations, parenting classes, or completed UAs. Lenz still worked with Father to give him a chance to complete his reintegration plan. By November 2015, Father had completed some of his reintegration tasks and was again granted weekly visits with M.G. His first visit since December 15, 2015, occurred on April 14, 2016. During the few visits Father attended after April 2016, M.G. cried out for "Mama or Dada or Joe Joe," M.G.'s foster mother, father, and brother.

Lenz did not believe that M.G. and Father ever bonded. Nevertheless, Lenz testified that M.G. had bonded to and was happy with her foster family. Lenz also emphasized that two alternative permanent placement options existed: adoption of M.G. by her foster parents or by her paternal cousin. Thus, Lenz recommended that the trial court find Father unfit and unlikely to change in the foreseeable future.

Last, Patricia W. testified that M.G. was placed with Patricia and her husband when she was just five weeks old. When the trial occurred, M.G. had been in Patricia's care for more than 2 1/2 years. Patricia testified that despite offering to send Father pictures and updates of M.G., Father never responded.

Father's cousin, Michael E., testified that Father and K.R. first came to him and his wife to request that they take M.G. into foster care after the court adjudicated M.G. a CINC in 2014. Michael testified that he and his wife agreed that they would foster M.G. In preparing for their role as foster parents, Michael and his wife obtained mental health evaluations and rented a residence in Kansas. As explained, Michael and his wife acted as M.G.'s foster parents for less than one week. Michael also testified that he witnessed Father and M.G. interacting at the KVC office. Michael testified that Father would play with and talk to M.G. and that M.G. did not cry during those interactions.

Michael testified that he and his wife would do whatever was necessary to give Father additional time to become an appropriate parent for M.G.:

> "I think he should be given more time and I'm willing to do whatever it takes to help him . . . . I have a three-bedroom, two-and-a-half bathroom house, I have two dependable vehicles. Whatever he needs, my wife and I are willing to be there for him. He can move in, we'll take over the baby, whatever needs to be done."

Nevertheless, Michael testified that Father never requested living or transportation assistance. Michael had never driven Father to visit M.G., nor had Father lived with Michael at any point.

Michael described M.G.'s foster parents as "wonderful people." Michael testified he felt that M.G. had a bond with her foster parents and that he told KVC to let M.G. go

6

back to her foster parents, in part, because of that bond and because Michael wanted what was best for M.G.

Andrea, who is Father's cousin, testified that Father should be given additional time to complete his reintegration plan. She, too, offered to help Father in any way needed. Still, Andrea admitted that Father had never contacted her for help.

Father testified about coming to terms with his past criminal convictions. First, when Father was 17 years old, he assaulted his brother. That assault conviction required Father to move out of his family home and into a friend's home. While living with that friend, Father stabbed another person to death. Father claimed that the death was an accident. After pleading guilty to that crime, Father spent more than eight years in prison. While incarcerated, Father participated in mentoring classes and obtained his GED. Father was charged with committing domestic violence against K.R. in 2014. After that, Father was charged with violating his no contact order with K.R. Father, however, still believes that K.R. has falsely accused him of committing domestic violence against her.

Father testified that while K.R. was pregnant with M.G., he lived with K.R. and purchased several things for the baby. Father testified that he was in the hospital when M.G. was born but did not sign the birth certificate because he wanted a DNA test performed to ensure M.G. was his child. Father suspected that he was not M.G.'s father because K.R. had allegedly engaged in prostitution when she was a minor. Father admitted that he asked K.R. to abort M.G. when he first learned she was pregnant.

Father testified that he knowingly did not participate in his reintegration plan because he believed that K.R. would quickly and successfully complete her own plan. Father admitted that for 1 1/2 years that M.G. was in State custody, the only thing he did towards completing his reintegration plan was take a parenting class. That parenting class

7

was an eight-hour, online parenting course, for which he presented KVC with a certificate of completion.

KVC allowed Father one-hour monthly visits with M.G. Father admitted that he visited M.G. outside of KVC visitations and that he did not attend or schedule all of his allowed monthly visits. It was not until 2016 that Father began having consistent visits with M.G. through KVC. Father conceded that he was sometimes late to visits with M.G., but he blamed his work schedule for his tardiness. Father testified that during KVC visits, M.G. would cry but he would then comfort her and she would eventually stop crying.

Father testified that he had stable housing because he lived in his brother's home for the preceding three years. Father did not, however, pay rent and was not named on the lease. The residence did have an extra room for M.G. Father also testified that he had food in the home and that his brother had completed a background check.

Before trial, Father also completed a level-one mental health evaluation. Nevertheless, Father waited to get the evaluation until his reintegration plan had long expired. Father admitted that he had attended only one therapy session and had waited until after the second time he had been referred to therapy to actually use the resource. Still, Father maintained that he was willing to continue attending therapy.

By the time of trial, Father was employed. Father first provided KVC with proof of employment in November 2015. Father claimed that he maintained employment throughout the entire time that he was not incarcerated. Father also testified that he had insurance and a valid driver's license and gave KVC records of those as well.

Father admitted that KVC was thorough in assisting him throughout the reintegration process. Father admitted that around August 2015, he stopped contacting his case worker, stopped attending visits, and stopped taking UAs. Father admitted that KVC

twice completed the necessary paperwork to complete an ICPC for his home but he failed to turn the paperwork in on time. KVC paid for Father to attend a psychological evaluation. KVC also paid for Father's therapy sessions.

Father testified about his ability to raise M.G. if given the opportunity. He testified that he lived close to a daycare, that he would provide her with insurance, and that he planned to continue to live with his brother. Father testified that he was paying $25 per month in child support but recognized that $25 per month would be insufficient if he had residential custody of M.G. Father admitted that he had not budgeted for the likely cost of raising M.G. on his own. Father also admitted to testing positive for opiates in October 2016 and for alcohol in December 2016.

The trial court held that Father was unfit to serve as M.G.'s parent and that Father's unfitness was unlikely to change in the foreseeable future. The trial court also held that it was in the best interests of M.G. that Father's parental rights be terminated.

*Standard of Review*

Before terminating parental rights, the trial court must find that the State proved by clear and convincing evidence that the parent is unfit and the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future and by preponderance of the evidence that termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(a), (g)(1).

In reviewing a trial court's decision terminating parental rights, an appellate court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and

9

convincing evidence is "an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. This court does not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

*Clear and Convincing Evidence Supported the Termination of Father's Parental Rights.*

Father argues that insufficient evidence existed to support a finding of unfitness and that the evidence did not support a finding that unfitness could not change in the foreseeable future. The State responds by asserting that Father's lack of effort over several years to complete a reasonable reintegration plan constitutes clear and convincing evidence that he is unfit as a father and that unfitness in unlikely to change. The State, therefore, maintains that it is in M.G.'s best interests that Father's parental rights be terminated.

Once a child has been adjudicated a CINC, termination of parental rights is governed by K.S.A. 2017 Supp. 38-2269. Ordinarily, the trial court evaluates whether a parent is unfit by considering a nonexclusive list of factors in K.S.A. 2017 Supp. 38-2269(b) and (c). Any one of the factors standing alone may, but does not necessarily, provide sufficient grounds for termination. K.S.A. 2017 Supp. 38-2269(f).

*The Trial Court's Findings*

The trial court relied on four statutory factors to find Father unfit:

1. The agency made reasonable efforts to rehabilitate the family but such efforts were unsuccessful, K.S.A. 2017 Supp. 38-2269(b)(7);

10

2. Father failed to make reasonable efforts to adjust his circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 2017 Supp. 38-2269(b)(8);

3. Father failed to maintain regular visitation and contact with the child, K.S.A. 2017 Supp. 38-2269(c)(2); and

4. Father failed to carry out a reasonable plan, approved by the trial court, which was directed toward the reintegration of the child into Father's home, K.S.A. 2017 Supp. 38-2269(c)(3).

*The State Presented Clear and Convincing Evidence of Father's Unfitness.*

As noted by the trial court, Lenz acted as the case manager since May 2015. For years, Lenz made herself available to Father by text and by phone call. Lenz coordinated visits and referred Father to parenting classes. KVC provided Father with cost-free drug and alcohol testing. KVC also provided Father with free therapy services. Lenz and KVC's efforts to help Father complete his court-approved reintegration plan were thorough and lasted for more than two years. Father even admitted that these efforts were thorough. Despite those efforts, Father waited until his reintegration plan expired before making any effort to complete the necessary tasks. Once these attempts finally began, Father still failed to complete the reasonable, court-approved plan for reintegration.

Father's reintegration plan required, in part, that he: (1) obtain suitable living conditions, (2) receive a mental health evaluation, (3) maintain employment and provide documentation of employment, (4) practice appropriate, violence-free parenting skills, (5) abstain from breaking the law, and (6) participate in approved visitations with M.G.

11

Lenz testified that Father seemed to understand his reintegration plan and the tasks that had to be accomplished to complete his plan. Lenz testified that Father never suggested that he didn't understand the reintegration process, nor any paperwork been submitted showing Father had any form of a cognitive disability.

Father testified that because he believed that M.G.'s mother would successfully complete her reintegration plan, he did not try to complete his own plan. Thus, Father waited until his reintegration plan had expired before even starting the reintegration process. Lenz testified that as of April 2015, she had received no proof of Father's progress in his reintegration program. Father provided no proof of income or employment, suitable housing, transportation, mental health evaluations, parenting classes, or completed UAs. Lenz acknowledged that by the time of trial, Father had completed at least some tasks in his reintegration plan but waited till the expiration of his reintegration plan to work toward completing it.

For example, Father submitted proof of employment, housing, and a mental health evaluation. Father, however, still committed violent offenses, failed to participate in consistent visits with M.G., and did not meaningfully participate in therapy. The record also shows that Father twice failed to complete the ICPC process for his residence and failed two UAs. Also, Father's residence could not be considered "stable" because he admitted that he was not on the lease and did not pay rent. Alarmingly, the owner of the residence is Father's brother, who Father had previously assaulted and allegedly attempted to stab.

K.R. testified that Father sometimes drank and often failed to assist in paying rent and other bills. K.R. also testified that Father choked and hit K.R. while pregnant, sometimes requiring hospitalization.

According to Lenz, Father's sporadic visitations caused M.G. to forget who he was and would cause her to fear Father. During the visits Father did attend, M.G. cried out for "Mama or Dada or Joe Joe," M.G.'s foster mother, father, and brother. Lenz testified that as of the trial date,

> "[M.G.] ha[s] been in out-of-home care for 33 of the 34 months of her life. During that time [Father] has had the opportunity to work on his case plan tasks and to build a relationship with [M.G.]. He has shown a lack of commitment to the reintegration of [M.G.], which is evident in his lack of cooperation in the two failed ICPC's, his delayed participation in services to address his past history of violence and mental health concerns.
>
> "He has been inconsistent with visits and lack of engagement with [M.G.] during these visits. And he has stated in the past that he was going to relinquish his rights and then he changed his mind."

Ultimately, Lenz did not think that M.G. and Father ever established a bond.

Thus, clear and convincing evidence supports the trial court's finding that Father was unfit and unable to care for M.G.

*The Conduct or Condition Rendering Father Unfit is Unlikely to Change in the Foreseeable Future.*

Clear and convincing evidence must support the trial court's finding that the conduct or condition rendering Father unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). In defining foreseeability, we calculate the time frame through the lens of how children experience the passage of time. K.S.A. 2017 Supp. 38-2201(b)(4); see *In re L.B.*, 42 Kan. App. 2d 837, 842, 217 P.3d 1004 (2009) (requiring cases be decided in "child time" rather than "adult time"), *rev. denied* 289 Kan. 1278 (2010). Father's past conduct may be used as an indicator of his future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776,

13

2015 WL 2343435, at *8 (Kan. App.) (unpublished opinion), *rev. denied* 302 Kan. 1010 (2015); *In re N.A.K.*, No. 118,376, 2018 WL 3077085, at *9 (Kan. App.) (unpublished opinion), *petition for review filed* July 23, 2018.

Father argues that if given the opportunity, he could establish fitness within the foreseeable future. Father emphasizes that his family is willing to provide any additional support necessary to establish fitness. We find Father's argument unconvincing; his violent past also contradicts his assertions.

First, Father places too much emphasis on his family's ability to parent M.G. and assist in the changes necessary to establish fitness. While familial assistance is permitted, it is not Father's family that must establish fitness; Father, himself, must establish parental fitness. Additionally, Father's family testified that they offered Father the support he needed before the trial court found Father unfit. Father did not use this help when it was first offered and does not support his argument that he intends to use it now or in the near future. Moreover, this contradicts the argument that his unfitness is likely to change in the foreseeable future.

*Finding that Termination of Parental Rights is in the Best Interests of the Child*

Following a finding of unfitness, the trial court next must determine if termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1). Our Supreme Court has noted that the trial court is in the best position to make that determination, and this court may not overturn that decision without finding an abuse of discretion. See *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002). A trial court abuses its discretion if its decision is one that no reasonable person could accept or if its decision is based on a factual or legal error. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011).

14

Here, Father had nearly three years to show a likeliness to change his conduct or condition to better meet the physical, mental, and emotional needs of M.G. As pointed out earlier, Father has shown that he is unlikely to do so. Given the time and effort spent in trying to reintegrate him with his daughter, a reasonable person could agree with the trial court in concluding that M.G. was best served by the termination of her relationship with Father.

For the reasons explained, we find clear and convincing evidence of the factors necessary to terminate parental rights under K.S.A. 2017 Supp. 38-2269(a): that the agencies made reasonable efforts to rehabilitate the family but such efforts were unsuccessful, K.S.A. 2017 Supp. 38-2269(b)(7); that Father failed to make reasonable efforts to adjust his circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 2017 Supp. 38-2269(b)(8); that Father failed to maintain regular visitation and contact with the child, K.S.A. 2017 Supp. 38-2269(c)(2); and that Father failed to carry out a reasonable plan, approved by the trial court, which was directed toward the reintegration of the child into Father's home, K.S.A. 2017 Supp. 38-2269(c)(3). Moreover, under K.S.A. 2017 Supp. 38-2269(g)(1), the termination of Father's parental rights is in the best interests of the child.

Affirmed.